Opinion issued
December 29, 2011.



In
The

Court of
Appeals

For
The

First District
of Texas

————————————

NO. 01-10-01116-CV

———————————

Vasudev Shenoy and Dario Zuniga, Appellant

V.

Penny Jean,
individually, and as wrongful death beneficiary of willie anne Jeane, deceased,
and on behalf of the estate of Willie Ann Jean, deceased, and on behalf of all
wrongful death beneficiaries of Willie Ann Jean, DECEASED, Appellee



 



 

On Appeal from the 151st District Court

Harris County, Texas



Trial
Court Case No. 2010-28302

 



 

MEMORANDUM
OPINION

 

          In this interlocutory
appeal,[1]
Dr. Shenoy and Dr. Zuniga appeal the trial court’s orders denying their motion
to dismiss Penny Jean’s healthcare liability claim for failure to serve an
adequate expert report.  SeeTex.
Civ. Prac. & Rem. Code Ann.§ 74.351(a) (West 2011).  Penny’s mother, Willie Ann Jean, died
approximately three weeks after gallbladder surgery as a result of hypoxic
encephalopathy.  Dr. Zuniga performed the
surgery.  Dr. Shenoy, a cardiologist,
cleared Jean for the surgery.  

In two issues, Shenoy contends that the trial
court abused its discretion in denying his motion to dismiss because Jean’s
expert, Dr. Mazzei, an anesthesiologist, is not qualified to opine on the
applicable standard of care for a cardiologist, breach of that standard or
causation, and his report does not adequately address standard of care, breach,
or causation.  In his sole issue, Zuniga
contends that the trial court abused its discretion because (1) Mazzei is not
qualified to offer an opinion on the applicable standard of care for a surgeon,
(2) the report does not address how Zuniga caused Willie Ann’s death beyond
mere conclusions, and (3) it is “impermissibly cumulative”—that is, it does not
adequately identify the particular breaches of the standard of care or
causation with respect to each separate defendant.  We reverse and render an order
dismissing the claims against Shenoy and Zuniga.

Background

          Mazzei’s expert report provides the
background facts in this case.  The
medical records are not before us, and we accept the factual statements for the
limited purpose of this appeal.[2]

          Willie Ann Jean, age 57, was taken by
ambulance to the emergency room of Doctor’s Hospital on February 15,2008,
complaining of abdominal pain, vomiting, chest pain of three hours’ duration,
and difficulty breathing.  As part of her
admission, Willie Ann gave an extensive medical history that included diabetes,
hypertension, angina, surgery for a brain aneurysm, coronary artery disease,
chronic obstructive pulmonary disease, hypercholesterolemia, and a prior
myocardial infarction.  Willie Ann
reported she had experienced abdominal and chest pain for years without
treatment.  Based on a physical
examination and ultrasound, the emergency room physician, Dr. Mireles,
determined that she had polyps and diagnosed symptomatic gallstones in her
gallbladder.  He recommended that she
undergo surgery to remove her gallbladder. 
He ordered a surgical consultation and a cardiology consultation.

          Shenoy, a cardiologist, saw her that
same day, and noted that Willie Ann had atwo- to three-year history of
epigastric and right upper quadrant abdominal pain as well as a history of a
previous myocardial infarction and a cereberovascular accident (i.e., a
stroke).  Shenoy noted that Willie Ann
had suffered chest pain, accompanied by shortness ofbreath and sweating for
four to six hours earlier that day. 
Willie Ann also had an abnormal electrocardiogram (EKG).  Shenoy’s diagnosis was that Willie Ann had
sufferedan acute myocardial infarction, symptomatic gallstones, hypertension,
and diabetes.  

          Zuniga, a surgeon, performed the
surgical consultation three days after her initial admission, on February 18,
2008.  Zuniga confirmed the presence of
gallstones, diagnosed inflammation of the gallbladder, and cleared Willie Ann
for surgery to remove her gallbladder the next day, February 19, subject to a
cardiology assessment.  Dr. Shenoy saw
Willie Ann again on February 18.  A
nuclear test was negative for ischemia. 
Shenoy also ordered an EKG, the results of which are included in
Mazzei’s report but the significance of which are not explained.  Shenoy cleared Willie Ann for the gallbladder
surgery.   

           Dr. Amin-Sankar, an anesthesiologist,
performed a preoperative anesthesia assessment on February 19.  He noted Willie Ann’s past medical history,
including her acute myocardial infarction and abnormal EKG.  Amin-Sankar cleared Willie Ann for surgery.  

          On February 19, 2008, Zuniga
performed the surgery.  The surgery was
an “uneventful” procedure.  After leaving
the post-anesthesia careunit (PACU), Willie Ann was to be sent to the intensive
care unit because she had fluctuating oxygen saturation levels, inadequate
ventilation, and shallowness of breath. 
Shortly thereafter, she was transported back to the PACU and was placed
on a ventilator.  According to Mazzei’s
report, Amin-Sankar prematurely extubated Willie Ann ten minutes later.Within a
few minutes, Willie Ann was in respiratory arrest.  She received CPR and medications, and
Amin-Sankarreintubated her.  

          Thirty minutes later, Willie Ann was
returned to the ICU.  According to
Mazzei’s report, Jean became “agitated” and had trouble with the
ventilator.  She extubated herself and
suffered a second respiratory arrest. 
She was re-intubated and given medications. An EEG the following day
showed possible hypoxic encephalopathy—brain damage caused by lack of
oxygen.  A follow-up EEG the next day
also indicated hypoxic encephalopathy. 
Mazzei’s report does not discuss whether the EEGs differentiate between
any damage caused by the first extubation and arrest and the second extubation
and arrest. Willie Ann was unresponsive to stimuli, including painful
stimuli.  On February 25, Willie Ann was
transferred to another facility for long-term care.  She died on March 5, 2008 due to the hypoxic
encephalopathy.

          Penny filed a wrongful death medical
malpractice suit against Doctor’s Hospital, Mireles, Amin-Sankar, Shenoy, and
Zuniga.[3]  Penny alleged that Shenoy and Zuniga were
negligent in clearing her mother for surgery. 
Specifically, Penny alleged that there was no emergency or urgent reason
to remove her mother’s gallbladder and that her mother had experienced
abdominal and chest pain for years without treatment.  In addition, Willie Ann had suffered an acute
myocardial infarction before the gallbladder surgery and had a history of
numerous health problems.  Although she
was stable, her history created additional risks that made her a poor candidate
for surgery, and therefore Shenoy and Zuniga negligently cleared Willie Ann for
the surgery.

          Penny timely served an expert report from
Mazzei, an anesthesiologist.[4]    Mazzei’s report focused primarily on the
anesthesiologist, Amin-Sankar. 
Concerning Shenoy and Zuniga, Mazzei stated that if Willie Ann “had not
undergone elective surgery on February 19, 2008, she would not have experienced
the respiratory arrests that resulted from her extubation and she would have,
in all probability, survived.”  

Concerning Amin-Sankar, Mazzei’s report states, “In
reasonable medical probability, if Ms. Jean had not been prematurely extubated,
she would not have had the increased demands placed on her body which caused
her subsequent respiratory arrest, anoxic brain injury and death.”  He further explained in his general discussion
of causation that the anesthesiologist should have been aware of the risks of
premature extubation.  A fair reading of
Mazzei’s report is that the premature extubation was the immediate cause of
death:

The time it takes for a
patient’s anesthesia effect to lessen enough for them to be able to breathe
independently varies from patient to patient and is affected by a patient’s
physiology and underlying disease processes. 
For a patient like Ms. Jean who had recently suffered a MI, it should have
been expected that it would take her a significant period of time before she
was capable of being extubated to breathe on her own.  This was not taken into account nor was her
clinical picture when she was untimely extubated [by the
anesthesiologist].  This caused her to
suffer a respiratory arrest which further stressed Ms. Jean’s ability to
recover from surgery and lead to another respiratory arrest with anoxic
encephalopathy and death . . . .  When
Ms. Jean extubated herself, the failure to address her increasing respiratory
distress resulted in a subsequent respiratory arrest causing the anoxic
encephalopathy which lead to her death.

 

          Shenoy and Zuniga moved to dismiss,
asserting that the report was inadequate to them.  The trial court granted Penny an opportunity
to amend the report.  After receiving the
amended report, Shenoy and Zuniga again moved to dismiss due to inadequacies in
the report.  The trial court denied the
motions to dismiss, and this interlocutory appeal followed.

Standard of Review

          We review a trial court’s ruling on a
motion to dismiss a healthcare liability lawsuit pursuant to Chapter 74 of the
Texas Civil Practice and Remedies Code under an abuse of discretion standard.See Am.
Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873,
875 (Tex. 2001) (reviewing dismissal under predecessor statute, section 13(e)
of article 4590i); Runcie v. Foley,
274 S.W.3d 232, 233 (Tex. App.—Houston [1st Dist.] 2008, no pet.).  A trial court abuses its discretion if it
acts in an arbitrary or unreasonable manner without reference to guiding rules
or principles or if it clearly fails to analyze or apply the law
correctly.  Runcie, 274 S.W.3d at 232.  In
reviewing whether an expert report complies with Chapter 74, we evaluate
whether the report “represents a good-faith effort” to comply with the
statute.  Strom v. Mem’l Hermann Hosp.
Sys., 110 S.W.3d 216, 221 (Tex. App.—Houston [1st Dist.] 2003, pet.
denied).  In making this evaluation, we
must look only at the information contained within the four corners of the
report.  Bowie Mem’l Hosp. v. Wright,
79 S.W.3d 48, 53 (Tex. 2002).

Adequacy of Dr. Mazzei’s
report

          In
their respective appeals, Shenoy and Zuniga attack various aspects of the
adequacy of Mazzei’s report, asserting it fails to meet the requirements of section
74.351 of the Texas Civil Practice and Remedies Code.SeeTex. Civ. Prac. & Rem. Code § 74.351(a). 

I.
      Chapter 74 expert report
requirements

          Pursuant to section 74.351,
medical-malpractice plaintiffs must provide each defendant physician and health
care provider with an expert report or voluntarily nonsuit the action. Id. 
If a claimant timely furnishes an expert report, a defendant may file a
motion challenging the report’s adequacy. 
Id.  The trial court shall
grant the motion only if it appears, after hearing, that the report does not
represent a good faith effort to comply with the statutory definition of an
expert report.  See id. § 74.351(l).  The statute defines an
expert report as a written report by an expert that provides, as to each
defendant, a fair summary of the expert’s opinions, as of the date of the
report, regarding: (1) the applicable standards of care; (2) the manner in
which the care provided failed to meet the standards; and (3) the causal
relationship between that failure and the injury, harm, or damages
claimed.  See id. § 74.351(r)(6);Gray v. CHCA Bayshore, L.P., 189 S.W.3d
855, 858-59 (Tex. App.—Houston [1st
Dist.] 2006, no pet.).

          Although the report need not marshal
all the plaintiff’s proof, it must include the expert’s opinions on the three
statutory elements—standard of care, breach, and causation.  See Palacios, 46 S.W.3d at 878; Gray,
189 S.W.3d at 859.  In detailing these
elements, the report must provide enough information to fulfill two purposes if
it is to constitute a good faith effort: first, it must inform the defendant of
the specific conduct the plaintiff has called into question, and, second, it
must provide a basis for the trial court to conclude that the claims have
merit.  Scoresby v. Santillan, 346 S.W.3d 546, 556 (Tex. 2011) (citingPalacios,
46 S.W.3d at 879).  A report that merely
states the expert’s conclusions as to the standard of care, breach, and
causation does not fulfill these two purposes. 
Id.  “‘[T]he expert must explain the basis of his
statements and link his conclusions to the facts.’”  Wright, 79 S.W.3d at 52 (quotingEarle
v. Ratliff, 998 S.W.2d 882, 890 (Tex. 1999)).  Furthermore, in assessing the report’s
sufficiency, the trial court may not draw any inferences, and instead must rely
exclusively on the information contained within the report’s four corners.  See Scoresby, 346 S.W.3d at 556 (citingPalacios, 46 S.W.3d at
878).

II.      Adequacy of report concerning causation

          Within his second issue, Shenoy
contends that Mazzei’s report does not adequately address causation of Jean’s
injuries as a result of any negligence by Shenoy.  As part of his sole issue, Zuniga similarly
argues that the report is inadequate in its statement of causation for his
alleged malpractice. 

          An expert report must
include a fair summary of the causal relationship between the defendant’s
failure to meet the appropriate standard of care and the injury, harm, or
damages claimed.  Tex. Civ. Prac. & Rem. Code Ann.
§ 74.351(r)(6).  An expert cannot
merely state his conclusions or “provide insight” about the plaintiffs’ claims,
but must instead “explain the basis of his statements to link his conclusions
to the facts.”Wright, 79 S.W.3d at
52.In explaining causation, the report must explain how the physician’s
conduct caused the plaintiff’s injuries. 
Id. at 53. 

          A.      Assertions in Mazzei’s expert
report regarding causation

Mazzei’s report asserts that
the applicable standard of care breached by Shenoy included the responsibility
to consider all of Willie Ann’s co-morbidities because these conditions placed Willie
Ann“at an unacceptably high risk for complicationsfrom surgery and
anesthesia.”  The report identifies two
risks from the surgery and anesthesia: (1) the stresses placed upon the
cardiovascular and respiratory system during surgery and anesthesia and (2) the
depression of the central nervous system and the resulting risk of
“experiencing cardiovascular and respiratory problems.”  It also generally states that a
patient’smedical history may increase these risks.  It does not, however, quantify or otherwise
describe the magnitude of risk for respiratory problems for a person undergoing
this surgery with normal health or compare that risk to the risk for a person
with pre-existing medical conditions like Willie Ann’s.  According to the report, these risks are
addressed by intubating the patient “so the anesthesiologist can ventilate the
patients while their central nervous system is depressed” and that intubation
normally continues “until the patient is able to again breathe on [his] own.”
The report continues:     

. . . .  Although complications arose as Ms. Jean was extubated
followingsurgery, these complications occurred because of the medical
conditions that shouldhave lead Dr. Shenoy to conclude that Ms. Jean was not an
appropriate surgicalcandidate. If Ms. Jean had not undergone elective surgery
on February 19, 2008, shewould not have experienced the respiratory arrests
that resulted from her extubation andshe would have, in all probability,
survived.

 

In the “Causation” section,
the report further states:

Ms. Jean was a patient who was
still recovering from her MI who never shouldhave undergone elective surgery.
By continuing to recommend the gallbladder removalsurgery, clearing her for
surgery and performing surgery, Ms. Jean’s healthcareproviders breached and
violated the standards of care as set forth above andproximately caused her
death.

 

Finally, Mazzei states for a patient like Willie Ann “it
should have been expected that it would take her a significant period of time
before she was capable of being extubated to breathe on her own.”

B.      Adequacy of the report concerning Shenoy

          Mazzei’s  report states that the medical conditions
that rendered Willie Ann unfit for surgery caused the complications that arose
when she was extubated (“these complications occurred because of the medical
conditions”).  What he fails to do is
provide a factual underpinning for that conclusion explaining why or how this
occurred and whether it was all her medical conditions listed in his report or
her myocardial infarction in particular that made the risk unacceptable and
caused her respiratory arrest.  These
omissions make the report conclusory and deficient for purposes of section
74.351.

1.    
Expert reports cannot be conclusory
to satisfy section 74.351. 

An opinion on causation stated without the underlying facts is
conclusory.  Jelinek v. Casas, 328 S.W.3d 526, 536 (Tex. 2010); Arkoma Basin
Exploration Co., Inc. v. FMF Assocs. 1990-A, Ltd., 249 S.W.3d 380, 389 n.32 (Tex. 2008).  A conclusory opinion is not probative.  City of
San Antonio v. Pollock, 284 S.W.3d 809, 818 (Tex. 2009); see Zamecnik
v. Indian Prairie Sch. Dist. No. 204, 636 F.3d874, 881 (7th Cir.
2011) (stating that mere conclusions are useless to the court). 

This rule is not a mere procedural hurdle.  Juries—or in the case of expert
reports, judges—are often confronted with conflicting expert
testimony.  One expert may testify that X
caused the plaintiff’s injuries while a different expert may testify that X did
not cause the plaintiff’s injuries.  The
factfinder typically lacks the expertise necessary to form an opinion without
expert assistance—this is why expert testimony is admitted in the first
place.  See Tex. R. Evid.
702.  It is the expert’s explanation of
“how” and “why” causation exists that allows the factfinder to weigh the
credibility of the expert’s opinion and, when expert opinions conflict, to
decide which testimony to disregard.  Cf. In re Christus Spohn Hosp. Kleberg,
222 S.W.3d 434, 440 (Tex. 2007) (detailing reasons why it is essential that the
jury have access to the facts and data underlying an expert’s testimony in
order “to accurately assess the testimony’s worth.”). With respect to expert
reports in healthcare liability claims, the expert’s explanation is what allows
the trial court to determine whether the claim has merit.See Jelinek, 328 S.W.3d at 539; see
also Scoresby, 346 S.W.3d at 552 (observing that Legislature enacted expert
report requirement to elicit expert opinions at an early stage of the
litigation to allow the trial court to determine that a basis exists for
concluding that the claims have merit). Expert testimony that merely states a
final conclusion on an essential element of a cause of action—such as causation—without providing a factual
basis for that conclusion does not aid the jury in its role as factfinder but,
rather, supplants it.  This, an expert
may not do.  See Greenberg Traurig of N.Y., P.C.v. Moody, 161 S.W.3d 56, 97
(Tex. App.—Houston [14th Dist.] 2004, no pet.) (“Expert testimony is admissible
to aid the jury in its decision, but it may not supplant the jury’s
decision.”). Similarly, an expert report that merely asserts that a defendant
physician’s breach caused the plaintiff’s injury without providing a factual
basis does not provide the trial court with the information necessary to
evaluate the merits of the plaintiff’s claim. See Jelinek, 328 S.W.3d at 529.

          The
requirement that the expert’s opinion must not be conclusory applies not only
to trial testimony, but to expert reports required by section 74.351(a).See Jelinek, 328 S.W.3d at 539–40; Wright, 79 S.W.3d at 53.In Jelinek, the Texas Supreme Court found
the trial court abused its discretion in denying a motion to dismiss because
the expert’s opinion on causation was conclusory.  328 S.W.3d at 539–40. The expert’s report
stated that “[the defendant’s] breach of the appropriate standard of care in
‘reasonable medical probability, resulted in a prolonged hospital course and
increased pain and suffering being experienced by [the plaintiff].’”  Id. at
539.  The Court emphasized, “[T]he report
says nothing more regarding causation.”  Id. 
The Court faulted the report for offering no explanation “tying the
conclusion to the facts” or of “how and why the breach caused the injury based
on the facts presented.”  Id. at 539–40.  This is precisely the information missing
here: the how and the why. 

In Gray,
this court held that the expert report contained a conclusory statement
concerning causation.  189 S.W.3d at
860.  The report stated that “[t]he
failure to monitor and detect the malpositioned left knee resulted in a
dislocated left patella, severe pain and suffering, and subsequent medical
treatment.”  Id. at 858.  Like the Supreme
Court in Jelinek, this court faulted
the causation opinion for failing to “convincingly tie the alleged departure
from the standard of care to specific facts of the case.”  Id.
at 860.  

2.    
Mazzei’s report was
conclusory on the issue of causation

Mazzei’s causation opinion regarding Shenoy’s decision
to clear Willie Ann for surgery was conclusory. Although Mazzei’s report states
that anesthesia depresses the respiratory system and places stress on the
heart, the report does not state that Willie Ann’s history of heart problems or
other conditions somehow made her more likely to suffer respiratory arrest after
premature extubation than a person without those medical conditions.  It does not state that her risks for the
complications that she experienced—respiratory arrest—were enhanced because of her
medical conditions.   The report does
generally discuss why Willie Ann’s other conditions affected her suitability
for surgery, but does not link her medical conditions to the complication she
experienced, respiratory arrest.  It
recognizes that a depressed central nervous system and the resulting risk of
respiratory problems are normal byproducts of anesthesia for even a person with
normal health.  In other words,
Mazzei’s report shows that the surgery itself created the risk and does not
state how or why Willie Ann’s pre-existing conditions changed those risks
except in conclusory terms. The report also states that those risks can be addressed by leaving her
intubated for “a significant period of time” before extubation. Mazzei’s report
makes it clear that he believes that the premature extubation was the immediate
cause of her death.  

A report may be sufficient if it states a chain of
events that begin with a health care provider’s negligence and end in a
personal injury.  SeePatel
v. Williams, 237 S.W.3d 901, 905 (Tex. App.—Houston [14th Dist.] 2007,
no pet.); see
alsoEnghv. Reardon, No. 01-09-00017-CV, 2010
WL 4484022, at *8 (Tex. App.—Houston [1st Dist.] Nov. 10, 2010, no pet.) (mem.
op.). But neither case involved an event as
remote as that involved here.  

In Patel, the
Fourteenth Court of Appeals held that an expert report sufficiently set forth
causation when it presented a chain of events beginning with an allegedly
negligent prescription and ending with the patient’s death.  Patel, 237 S.W.3d at 905–06. 
Patel prescribed Williams an anti-dementia drug.Id. at 903.  The report explained
that the drug was not FDA-approved for patients with Williams’s ailment and
that known side-effects of the drug included restlessness or a need to keep
moving.Id.  Williams’s family withdrew consent for the
drug, but Patel continued to prescribe it. 
Id.  Williams was being fed via feeding tube, and
allegedly due to the restlessness from the drug, she removed the tube.  Id.The
report identified nurses’ notes that described Williams as agitated and stated
that she kept pulling at her feeding tube.  Id.  The nursing staff improperly re-inserted the
tube, causing a small cut, which became infected because of the contents of the
feeding tube entering the cut.  Id. 
The cut developed into an abscess requiring multiple surgeries.  Id.  The report concluded that Williams’s death
was caused by the infection from the improperly re-inserted feeding tube.  Id.
at 904.  The Fourteenth Court held that
the trial court did not abuse its discretion in determining the report was not
conclusory or speculative concerning causation. 
Id. at  905–06. 


The report in this case is distinguishable.  The report identifies the alleged
breach—clearing Willie Ann for surgery with her medical history—as did the
report in Patel—prescribing an unapproved drug without consent.  See id.  But there the similarities end.  In Patel,
the report explained that a known side effect of the drug was restlessness, and
the restlessness caused Williams to become agitated and remove her feeding
tube.  Id.  Willie Ann likewise
became agitated and removed her breathing tube. 
The report, however does not explain any connection between clearing
Willie Ann for surgery or her medical history and her agitation.  While the report in Patel explained each step on the path of causation, the report in
this case does not.[5]

There were “many links in the chain of events” that
began with the pre-surgical clearance and ended with her death, but Mazzei
failed to explain and support each link. 
While Mazzei explains how Willie Ann’s premature extubation prevented her
from “maintain[ing] the oxygenation in the blood,” increasing her risk for
respiratory arrest, he fails to explain what role her pre-existing medical
conditions played in her respiratory arrest. It is here that we part company
with the trial court and find that it abused its discretion. Mazzei does not
link the alleged negligence—clearing Jean for surgery—with
the premature
extubation except that one occurred before the other.  That is not enough; it is only a statement of
“but for” causation.  If that is all that
section 74.351 requires to demonstrate causation, almost any prior action taken
by a health care provider could be said to cause the ultimate outcome.  For example, the referral by the emergency
room physician for the surgical consultation with Dr. Shenoy also was a cause
of Willie Ann’s death if all that is necessary is for an event to have preceded
the injury.

To establish cause in fact, Mazzei had to discuss why the act or omission was a substantial
factor in causing the injury and without which the harm would not have
occurred.W. Invs., Inc. v. Urena, 162 S.W.3d 547, 551 (Tex. 2005); see alsoTranscon. Ins. Co. v. Crump, 330
S.W.3d 211, 214 (Tex. 2010) (stating that plaintiff must prove “cause in
fact (or substantial factor)”); Ford
Motor Co. v. Ledesma, 242 S.W.3d 32, 46 (Tex. 2007) (stating that producing
cause requires that (1) the cause must be a substantial cause of the event in
issue and (2) it must be a but-for cause, namely one without which the event
would not have occurred).  The report does not do so. Mazzei’s report does not
link facts from the alleged negligence in clearing her for surgery to Willie
Ann’s death.  Willie Ann did not suffer a
cardiac arrest during or after the surgery; she suffered respiratory arrest and
only after a premature extubation. 
Mazzei does not state that Willie Ann suffered any unusual respiratory
issue during the surgery itself; the surgical procedure was “uneventful.”  And based on Mazzei’s report, it appears that
any patient—healthy or with a history of medical conditions—who is prematurely extubated
will not sufficiently “maintain the oxygenation in the blood” and therefore is
at risk for respiratory arrest.  The mere
fact that Willie Ann was cleared for surgery before her death does not mean that
the clearance for surgery caused her death. 
Jelinek, 328 S.W.3d at 533
(cautioning against the post hoc ergo
propter hocfallacy, that is, reasoning that an earlier event caused a later
event simply because it occurred first). 


A causal link can be too attenuated to satisfy the
causation requirement for an expert report. 
See Gonzalez v. Sebile, No.
09-09-00363-CV, 2009 WL 4668892, at *4 (Tex. App.—Beaumont Dec. 10, 2009, pet.
denied) (mem. op.).  In Gonzalez, the physician was sued for
clearing the patient for surgery without obtaining a cardiologist consultation
despite an earlier open heart surgery.  2009
WL 4668892at *2. 
According to the plaintiffs, the defendant anesthesiologist fell below
the standard of care by failing to disqualify the plaintiff as not fit for
surgery in part because of the risks of general anesthesia.  Id.  The court held that the report’s statement
that the plaintiff would not have been injured if he had not undergone surgery
in the first place was “too attenuated to set forth evidence of causation with
sufficient specificity to inform” the physician of the alleged misconduct and
to allow the trial court to conclude that the plaintiff’s claims had merit.  Id. at
*3.  Mazzei’s report suffers from the
same defect.

While Mazzei’s report “provides insight” concerning
the claims surrounding Jean’s death, it does not link the facts of the decision
to clear her for surgery  to the
conclusion that Shenoy’s alleged breach of the standard of care caused Jean’s
death.  It does not, therefore, provide a
basis for the trial court to have concluded that causation was demonstrated for
Shenoy’s decision to clear Willie Ann for surgery.  See
Palaciois, 46 S.W.3d at 879 (report must provide basis for concluding that
claims have merit).  We conclude,
therefore, that the report is conclusory and inadequate with respect to
Shenoy.  See Gray, 189 S.W.3d at 860; see
also Jelinek, 328 S.W.3d at 539–40 (finding report inadequate concerning
causation because it did not explain “how and why the breach caused the injury
based on the facts presented”). 

          We sustain this portion of Shenoy’s
second issue.

          B.      Adequacy of the report concerning Zuniga

          Penny has not alleged, and Mazzei’s
report does not assert, that Zuniga negligently performed surgery; rather, the
surgery is described as “uneventful.”  For
the same reasons that the report is inadequate as to causation for Shenoy, we
conclude that, with respect to Zuniga, the report fails to explain how and why Zuniga’s
clearing of Willie Ann for surgery caused her death, fails to demonstrate the
causal link necessary to have a meritorious claim, and is conclusory and
inadequate.  See Gray, 189 S.W.3d at 860; Jelinek,
328 S.W.3d at 539–40.

          We sustain this portion of Zuniga’s
sole issue.[6]

Conclusion

          We reverse and render an order dismissing the claims
against Shenoy and Zuniga. 

 

                                                                   Harvey
Brown

                                                                   Justice


 

Panel consists of Chief
Justice Radack and Justices Sharp and Brown.

Sharp, J., dissenting.  Dissent to follow.

 











[1]        SeeTex. Civ. Prac. & Rem.
Code Ann.§ 51.014(a)(9) (West 2011).





[2]        See Bowie
Mem’l Hosp. v. Wright, 79
S.W.3d 48, 53 (Tex. 2002) (review of Chapter 74 report is limited to four
corners of report).





[3]           Only Shenoy and Zuniga are parties to
this appeal.

 





[4]        SeeTex. Civ. Prac. & Rem.
Code Ann.§ 74.351(a).





[5]           The report in this case is similarly
distinguishable from the report in Engh.  In Engh,
the report identified the alleged breach—placing a surgical clip on the ureter
during surgery.  2010 WL 4484022 at
*6.  The report also explained the
consequences of a clipped ureter. 
Specifically, the report detailed how damage to and, eventually, loss of
the kidney would result from clipped ureter. 
Id.  Thus, this court found the report adequate,
although Engh saw multiple other doctors and several months passed after his
surgery and before he lost his kidney.  Id. at *10.  The report explained how the alleged breach
caused the loss of Engh’s kidney, while the report here contains no explanation
of how clearing a patient with a history like Willie Ann’s causes premature
extubation, self-extubation, or the eventual death of the patient.





[6]           Because
we have sustained Shenoy’s second issue in part and Zuniga’s sole issue in
part, we do not address the other arguments raised by the parties.  SeeTex. R. App. P. 47.1.